UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| VIREO SYSTEMS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 3:14-cv-2359 |
| v. | ) Judge Sharp |
| | ) |
| HTG VENTURES, LLC, | ) |
| JOHN T. LEWIS, JR., AND | ) |
| TIMOTHY KENSINGER | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Before the Court are Plaintiff Vireo Systems, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction (Docket No. 7) and Defendants HTG Ventures, LLC, John T. Lewis, Jr., and Timothy Kensinger's Motion to Dismiss for Failure to State a Claim (Docket No. 36). On March 25, 2015, the Court heard oral argument on Plaintiff's Motion. For the reasons set forth below, both pending motions will be denied.[1]

## I. SUMMARY OF THE FACTS

Plaintiff Vireo Systems, Inc. ("Vireo") is a Tennessee corporation owned by Mark Faulkner. Its principal place of business and manufacturing facilities are located in Tennessee. Vireo manufactures "dietary supplements, chemical compounds, and nutraceuticals based on a molecule created by Mr. Faulkner, creatine hydrochloride ("C-HC1"). C-HC1 is the main component of CON-CRET, an exercise supplement that advertises benefits including development of lean muscle, accelerated muscle recovery, and improved endurance. CON-CRET is sold in

---

[1] Defendants have also filed a Motion to Expedite Discovery (Docket No. 38) and Motion for Protective Order (Docket No. 50). As both of these motions related to preparation for the March 25, 2015 hearing, both will be denied as moot.

1

dietary supplement stores and fitness facilities in Tennessee and the rest of the United States.

Defendant HTG Ventures ("HTG") is a limited liability company with its principal place of business in Massachusetts. Defendants Lewis and Kensinger each hold an ownership interest in HTG and affiliate companies including Harvest Trading Group and Harvest Trading Group Technologies.

In 2007, the Parties' mutual contact Brian O'Neill, a resident of Tennessee, connected Mr. Faulkner with Mr. Lewis and Mr. Kensinger to explore marketing opportunities for Vireo products. The Parties, along with Mr. O'Neill, formed ProMera, a Massachusetts limited liability company, to acquire, develop, license, market, and distribute dietary and health supplements. To this end, Mr. Faulkner assigned the CON-CRET trademark to ProMera. Initially, ProMera's members entered into an "oral exclusive marketing and distribution agreement" under which Vireo manufactured the products that were then marketed and distributed by ProMera. (Docket No. 65 at 9). ProMera's three members held the following ownership interests: (1) HTG Ventures 51%, (2) Vireo 42%, and (3) Mr. O'Neill 7%.

In January 2010, the Parties and Mr. O'Neill signed an Operating Agreement setting forth the rights and obligations of ProMera's members. This contract designated Messrs. Lewis, Kensinger, and Faulkner to oversee the company "as the Mangers acting based on majority votes (at least two votes from the three Managers) among the Managers." (Docket No. 65-1 at 2, Operating Agreement § 1(a)). It also set forth the Managers' responsibilities, with Mr. Lewis and Mr. Kensinger "primarily responsible for the sales, marketing, distribution, logistics, support staff, administration and accounting for the Company Operations" and Mr. Faulkner "primarily responsible for the scientific development, licensing and oversight of the inventory control of the raw materials and products." (Id. at 4, § 2(c)). Managers and members agreed "to exercise

2

sound business judgment and good faith in all aspects of their decisions" and to act with "the same fiduciary duty to the Company and each other as directors and shareholders of a corporation under Massachusetts law." (Id. at 2, § 1(b)). The Operating Agreement further empowered the Managers with,

> the exclusive power and authority to (i) make all decisions with respect to the business and affairs of the Company; (ii) exercise all the powers and privileges granted by the Act or any other law or this Operating Agreement, together with any powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the business, trade, purposes or activities of the Company and … (iv) to take any other action not prohibited under the Act or other applicable law.

(Id., § 1(a)).

Section 2 of the Operating Agreement addressed capital contributions, providing that, "if any additional capital contribution is required for operation of the Company, HTG and Vireo shall make such required contributions which are proportionate to the Percentage Interests," and that capital calls would be "subject to review verification and approval by the Managers." (Docket No. 65-1 at 4, Operating Agreement §§ 2(a), 2(b)). Aside from these circumstances, however, "no Member [would] be obligated to contribute any additional capital to the Company." (Id., § 2(d)).

On March 22, 2011, Vireo and ProMera entered into a second contract, the Product Development Marketing Agreement ("PDMA"), which "memorialize[d] the parties' understanding of the Oral Agreement, memorializing the current structure of the transaction as well as restructuring it." (Docket No. 65-2, PDMA ¶ M).

According to the Amended Complaint, products manufactured by Vireo are bought by ProMera and resold at cost to Harvest Trading Group, an HTG affiliate. Harvest Trading Group then sells the products to third-party health food and nutraceutical companies at a mark-up more

3

than four times the price in the initial, internal sales. Despite this sizeable return, HTG affiliate companies charge ProMera a 6% fee on gross revenues, 5% sales commission on all ProMera products sold, and an unspecified fee of up to 5.5% on all sales. Plaintiff claims these arrangements, undertaken without its knowledge or consent, have resulted in a boon of hundreds of thousands of dollars to Mr. Lewis and Mr. Kensinger, and "very substantial undisclosed revenues" to HTG and its affiliates. (Docket No. 65 at 11). Plaintiff alleges Defendants concealed ProMera's true financial activity by recording its financial information in Harvest Trading Group's books.

Early in 2014, the Parties began to discuss the sale of ProMera to a third party, or alternatively, a buyout by one of its members. To increase the company's value in anticipation of the sale, they considered revising the PDMA to make it more favorable to ProMera. In a November 24 email to Defendants and Mr. O'Neill, Mr. Faulkner contemplated selling his share and stated, "It may be a good time for me to exit for a variety of reasons." (Docket No. 65-3). To this end, Mr. Faulkner thanked Defendants for their recent transmittal of ProMera financial information and asked them to coordinate with his accountant to review it.

The next day, November 25, Mr. Lewis sent Mr. Faulkner a Capital Contribution Notice via email, explaining,

> [t]he Managers of ProMera have considered our financial position carefully and determined that the Company requires capital in order to continue its operations. In the past the Company has funded its operations through advances from [HTG]. As of the date hereof the Company is indebted to HTG in the amount of $46,209. HTG no longer intends to advance funds to the Company to enable it to continue operations.

(Docket No. 65-5). Mr. Lewis listed a number of reasons why the capital infusion was necessary, including: (1) the recent flood of cheaper competitors to the market and the resulting decline in

4

sales; (2) the need for further research and development on new products; and (3) plans to fund a trade show and commission a performance study on CON-CRET Creatine HC1.

The attached Capital Contribution Notice, signed by Mr. Lewis and Mr. Kensinger, stated that "a majority of the Managers of the Company … have determined that the Company requires $1,475,000 in capital for the continued operation of the Company." (Docket No. 65-4 at 1). Based on their percentage ownership interests, HTG and Vireo were liable for 54.84% and 45.16% respectively, or $808,890 from HTG and $666,110 from Vireo, to be paid in two installments. (Id.). On the date of the first payment, December 18, 2014, HTG was to contribute $404,445 and Vireo $333,005. The remainder was due a month later. The Notice warned that "[f]ailure of either Member to contribute capital on or before the dates set forth in the foregoing Schedule will result in the recalculation of the Percentage Interests of the Members in accordance with their Capital Contribution to the Company." (Id. at 2).

Plaintiff claims that Defendants issued the Capital Contribution Notice in response to Vireo's request to review ProMera's financial information, and intended to "freeze Vireo out from involvement in ProMera." (Docket No. 65 at 15). In a letter dated December 2, 2014, Plaintiff's counsel communicated this assertion and notified Defendants of "Vireo's intention to investigate all aspects of ProMera, including financial transactions between ProMera and HTG." (Docket No. 65-6 at 1). The letter instructed Defendants to withdraw the Capital Contribution Notice by December 8, until such time as the Managers held a formal meeting on the subject. It also requested ProMera make its books and records available for an accountant's review on December 11, 2014.

In a letter dated December 8, Defendants refused to withdraw the Capital Contribution Notice and disputed the notion it had been made in bad faith or with retaliatory motive. (Docket

5

No. 65-7). The letter did not address Vireo's stated intention to review ProMera's books, but stated generally that ProMera's financial operations would be made fully transparent.

Plaintiff's counsel responded via email immediately, stating "Unless I hear differently, I will assume that the information will be available when Vireo's accountants arrive [on December 11]." (Docket No 65-8). With no word from Defendants, Plaintiff's accountant set off to Boston the following day to examine ProMera's books. While he was en route, Mr. Lewis notified the accountant that no documents would be made available to him and that his presence at ProMera's office would be considered trespassing.

Plaintiff filed the original Verified Complaint before this Court on December 16, 2014. (Docket No. 1). The Amended Verified Complaint alleges seven causes of action: (I) oppression/squeeze out; (II) declaratory relief; (III) breach of fiduciary duty; (IV) breach of ProMera's Operating Agreement; (V) violation of the Massachusetts Limited Liability Company Act; (VI) accounting; and (VI) injunctive relief. (Docket No. 65 at 19-26).

On January 13-14, 2015, ProMera allowed Plaintiff's accountants limited access to ProMera's financial information. However, Plaintiff maintains that Defendants have refused to allow the accountants to review and copy all of the documents that they are required to make available under the terms of the Operating Agreement, the PDMA, and the Massachusetts Limited Liability Company Act.

## II. APPLICATION OF LAW

### A. Temporary Restraining Order and Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat'l Resources Defense Council, Inc., 555 U.S. 7, 24 (2008). When presented with a motion for a temporary restraining order or preliminary injunction, the Court considers four factors: (1)

whether the party seeking injunctive relief has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the injunction is not entered; (3) the potential harm the injunction would cause the opposing party or others; and (4) the public interest. See Bays v. City of Fairborn, 668 F.3d 814, 818-19 (6th Cir. 2012); Davis v. Snyder, 2013 WL 6507336, at *2 (E.D. Mich. Dec. 12, 2013) (explaining that the "same factors are considered in determining whether to grant a request for either a temporary restraining order or a preliminary injunction") (citing Sandison v. Mich. High School Athletic Assoc., 64 F.3d 1026, 1030 (6th Cir. 1995)). These factors are "'interrelated considerations that must be balanced together'" rather than prerequisites to be satisfied individually. Ne. Ohio Coal. for Homeless and Serv. Emps. v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006) (citation omitted); accord United States v. Contents of Accounts, 692 F.3d 601, 608 (6th Cir. 2011). The Court need not make specific findings on each factor "'if fewer factors are dispositive of the issue.'" Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003)).

"'[T]he general rule is that a plaintiff's harm is not irreparable if it is fully compensable by money damages,'" Nat'l Viatical, Inc. v. Univ. Settlements Int'l, Inc., 716 F.3d 952, 957 (6th Cir. 2013). As the Court stated at the March 25 hearing, Plaintiff has failed to show that any potential losses caused by the termination of the Parties' business relationship could not be fully compensated through an award of money damages.

Mr. Faulkner identified three potential harms faced by Plaintiff in the absence of injunctive relief. First, if the capital contribution call is enforced – and Plaintiff does not participate – its shares in ProMera will be diluted. Second, if ProMera is sold after Plaintiff's ownership interest is reduced, Plaintiff will receive a smaller share of the sale proceeds. Third, any contribution

7

Plaintiff does make in compliance with the Capital Contribution Notice will be routed to Defendants and their affiliates. Mr. Faulkner testified that his partnership with Defendants has resulted in the loss of his intellectual property and brand, with a lower return on investment than anticipated. (Tr. at 11:00 a.m., March 25, 2015).

Having considered the Parties' filings and the testimony presented at the March 25 hearing, the Court concludes Plaintiff has not established that the equities weigh in favor of granting the extraordinary relief requested. While Plaintiff may likely prevail on the merits, and the potential harm to Defendants and public interest considerations are negligible, Plaintiff has failed to satisfy the irreparable harm element. Accordingly, and for the reasons stated on the record, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Docket No. 7) will be denied.

**B. <u>Motion to Dismiss</u>**

The Federal Rules of Civil Procedure require Plaintiff to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED R. CIV. P. 8(a)(2). Defendants assert that the Court lacks personal jurisdiction over HTG and that, with the exception of the cause of action for oppression/squeeze-out, Plaintiff fails to state a claim upon which relief can be granted.

*i. Personal Jurisdiction under Rule 12(b)(2)*

In order for the Court to exercise personal jurisdiction over Defendants, Plaintiff must show that Defendants have (or had) sufficient minimum contacts with Tennessee such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Youn v. Track, Inc. 324 F.3d 409, 417 (6th Cir. 2003). Where sufficient minimum contacts exist, a defendant has no basis to complain

because, by invoking the benefit and protections of the state's law, the defendant "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

Where the Court considers a motion for lack of personal jurisdiction based upon the pleadings, affidavits, and other written submissions of the Parties, Plaintiff need only make a *prima facie* showing of jurisdiction.[2] See Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 449 (6th Cir. 2012). This is a fairly "relaxed standard." Smartvue Corp. v. Mistral Software PVT. LTD, 2012 WL 3000144, at *2 (M.D. Tenn. July 23, 2012). Minimum contacts exist where a defendant purposefully avails itself of the privilege of conducting activities within the forum state. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).

Personal jurisdiction may be either specific or general. See e.g., Fortis Corporate Ins. v. Viken Ship Mgmt., 450 F.3d 213, 218 (6th Cir. 2006). "Specific jurisdiction 'subjects the defendant to suit in the forum state only on claims that arise out of or relate to defendant's contact with the forum.'" Id. (citation omitted). That is, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction," whereas general jurisdiction emanates from contacts that "are so continuous and systematic as to render [defendant] essentially at home in the forum state." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2486, 2581 (2011) (citation omitted).

The exercise of specific jurisdiction over a non-resident defendant is valid only if it meets both the state long-arm statute and constitutional due process requirements. See Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000). Thus, "if jurisdiction is not proper under the due process clause, it is unnecessary to analyze jurisdiction under the state long-arm statute, and vice

---

[2] The Court limited the March 25 hearing to the matter of injunctive relief. (Tr. at 9:16).

9

versa." Conn v. Zakharov, 667 F.3d 705, 711-12 (6th Cir. 2012).

Tennessee's long-arm statute provides for jurisdiction over nonresident persons (including corporations and all other entities that would be subject to service if present in the State) "as to any action or claim for relief arising from … [t]he transaction of any business within this state." T.C.A. § 20-2-214(a)(1). Furthermore, "Tennessee's long-arm statute has been interpreted to be 'coterminous with the limits on personal jurisdiction imposed' by the Due Process Clause of the United States Constitution," and, therefore, "'the jurisdictional limits of Tennessee law and of federal constitutional law of due process are identical.'" Intera Corp. v. Henderson, 428 F.3d 605, 616 (6th Cir. 2005) (citation omitted). Thus, the Court "'need only determine whether the assertion of personal jurisdiction violates constitutional due process.'" Id. (citation omitted).

The Court looks to three criteria to determine whether specific jurisdiction may be exercised constituent with due process: "(1) purposeful availment 'of the privilege of acting in the forum state or causing a consequence in the forum state,' (2) a 'cause of action ... aris[ing] from activities' in the state, and (3) a 'substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.'" Schneider v. Hardesty, 669 F.3d 693, 702 (6th Cir. 2012) (quoting S. Machine Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381-82 (6th Cir. 1968)).

The first criteria, purposeful availment, is "'essential' to a finding of personal jurisdiction," Intera, 428 F.3d at 616, and the question of whether a defendant availed itself of the privilege of acting in a state is determined by reference to the defendant's actions rather than the plaintiff's actions. See Nationwide Mut. Ins. Co. v. TRYG Intern. Ins. Co., 91 F.3d 790, 795-96 (6th Cir. 1996). "Parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State

for the consequences of their activities." Burger King Corp., 471 U.S. at 473.

In the current case, Plaintiff has satisfied the "relatively slight" burden to make a *prima facie* showing of jurisdiction. Smartvue Corp., 2012 WL 3000144, at *2 (citing Carrier Corp., 673 F.3d at 449). As for the first element, the Court finds Defendants' assertion that "HTG has *no* connection to Tennessee" entirely implausible. (Docket No. 37 at 9) (emphasis in original).

HTG, a "person" within the meaning of Tennessee's long-arm statute, T.C.A. § 20-2-214(a)(1), purposefully availed itself of the privilege of acting in Tennessee by forming a limited liability company with Vireo, a Tennessee corporation, and Mr. O'Neill, a Tennessee resident, both of whom signed the ProMera Operating Agreement in the forum. Plaintiff provides a laundry list of Defendants' subsequent transaction of business within Tennessee. (Docket No. 43 at 9). For instance, Mr. Faulkner asserts that Defendants placed telephone calls regarding ProMera to him in Tennessee "on nearly a daily basis" between 2007 and 2012. (Docket No. 44-1 at ¶ 3 & 4). Defendants also travelled to Tennessee to meet with Mr. Faulkner regarding ProMera's business on more than one occasion. (Id. at ¶ 8). The Capital Contribution Notice at issue was drafted by Defendants and sent to Plaintiff in Tennessee. Finally, ProMera products are sold at retail outlets in Tennessee, presumably through marketing and distribution efforts overseen by HTG, from which Defendants receive financial benefits. (Id. at ¶ 10).

Defendants endeavor to separate themselves from this considerable list of contacts by relying on their alternative executive identities. They claim HTG existed "solely as an investor to ProMera" that "did not take direct action toward Vireo or any other Tennessee resident." (Docket No. 37 at 8). Instead, when Defendants Lewis and Kensinger communicated with Mr. Faulkner in Tennessee, or visited the State, they did so in their capacity as ProMera managers exclusively. Defendants claim HTG's only "arguable tie to Tennessee is through the ProMera Operating

Agreement," but that this is insufficient to constitute "purposeful availment" for purposes of personal jurisdiction, citing Pease Constr., Inc. v. Crowder-Gulf Joint Venture, LLP, 2011 WL 2118662 (W.D. Tenn. May 27, 2011), for the contention that the mere act of entering into a contract in the forum state does not establish minimum contacts. (Id. at 9).

Defendant is correct that "entering into a contract with an out-of-state party *alone* does not automatically establish sufficient minimum contacts." Air Prods. and Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544, 551 (6th Cir. 2007) (emphasis in original) (citing Burger King, 471 U.S. at 473, 478-79). It is one factor that, considered with "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," may indicate purposeful availment. Id. However, the business relationship between the parties in Pease is easily distinguishable from the current case and, in comparison, illustrative of why this Court's exercise of jurisdiction in this case is reasonable.

In Pease, an Alabama contractor engaged a Tennessee corporation as subcontractor to haul debris on a single construction project located in Texas. The subcontractor later filed suit for breach of contract in the Western District of Tennessee. The court granted the defendant contractor's motion to dismiss for lack of personal jurisdiction, noting that "[c]ourts in this circuit have concluded that defendants do not purposefully avail themselves of the privilege of acting or causing a consequence in a forum state based on one-time, project-based contractual relationships." Pease, 2011 WL 2118662, at *6. Absent any suggestion that the parties "intended to create business relationship lasting beyond" the single project, the court concluded the exercise of personal jurisdiction over the defendant "would not comport with federal due process." Id. at 8.

The current case is far more analogous to Air Products, where the Sixth Circuit reversed a

district court in Michigan and found personal jurisdiction existed where the defendant, a Kansas corporation, engaged in a "continuing business relationship that lasted a period of many years" with a Delaware corporation whose principle place of business was in Michigan. 503 F.3d at 551. The court emphasized "several hundred" correspondences between the parties, many of which were initiated by defendant. Id. While "'[a] numerical count of the calls and letters has no talismanic significance,'" the court found they were "the type of contacts that demonstrated purposeful availment" because they were made in furtherance of the business relationship between the parties. Id. (citing LAK, Inc. v. Deer Creek Enters., 885 F.2d 1293, 1301 (6th Cir. 1989)).

The record in the current case is replete with examples of HTG's "deliberate conduct that amounts to purposeful availment." Id. at 551. HTG formed ProMera with a Tennessee corporation and a Tennessee resident. In furtherance of this business relationship, Defendants directed near-daily communications at Plaintiff in Tennessee over the course of many years and attended business meetings in Tennessee. These are the same "type of contacts" that the Sixth Circuit found satisfied the purposeful availment requirement of the personal jurisdiction inquiry. Id. at 552.

Defendants' attempts to insulate HTG behind the shield of the executive arrangement, contending these contacts with Tennessee were undertaken exclusively by ProMera, are entirely unconvincing. It would be simply unrealistic to accept that the dual identities and interests of ProMera's members, or those of its managers, could be so cleanly separated. When Defendants acted on behalf of ProMera, they obviously did so while also representing the interests of HTG, ProMera's majority interest holder. Furthermore, insofar as HTG breached fiduciary and contractual duties owed to Plaintiff, those claims are correctly directed at HTG.

The second element, that Plaintiff's claims must "arise from" Defendants' contacts with

13

Tennessee, is also satisfied here. This is a "lenient standard" as "a cause of action need not 'formally' arise from defendant's contacts." Air Products, 503 F.3d 544 at 553 (citing Bird v. Parsons, 289 F.3d 865, 875 (6th Cir. 2002)). In similar circumstances, the Sixth Circuit has concluded this element is satisfied when the alleged harm would not have occurred if Defendants had not "engaged in a long-term business relationship" with Plaintiff. Id.

For the final element of the personal jurisdiction inquiry, reasonableness, the Court looks to a number of factors including "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolutions of controversies." American Greetings Corp., 839 F.2d at 1169-70 (citing Asahi Metal Indus. Co. Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 113 (1987)). The minimum contacts established in the first element are "considered in light of [the] factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King Corp., 471 U.S. at 476 (citing Int'l Shoe Co., 326 U.S. at 320). "[W]here a defendant who has purposefully directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477.

The Court's review of HTG's contacts with Tennessee in light of the factors listed above does not uncover any concerns that outweigh the "inference of reasonableness" arising where the preceding elements of the personal jurisdiction inquiry are met. Theunissen v. Matthews, 935 F.2d 1454, 1461 (6th Cir. 1991) (citing Am. Greetings Corp. v. Cohn, 839 F.2d 1164, 1170 (6th Cir. 1988)); see also Air Products, 503 F.3d at 555 (finding the travel burden on defendants litigating in a foreign forum did not outweigh Michigan's clear interest in "protecting a company whose principle place of business is located in Michigan."). Given the fairly lenient standard

applied to this inquiry, the Court concludes that Plaintiff has satisfied the elements for a *prima facie* showing of jurisdiction over HTG and its fellow Defendants.

*ii. Failure to State a Claim under Rule 12(b)(6)*

When considering a motion to dismiss under Rule 12(b)(6), the Court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007); Inge v. Rock Fin. Corp., 281 F.3d 613, 619 (6th Cir. 2002). The Court must assume that all of the factual allegations are true, even if they are doubtful in fact. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In contrast, legal conclusions are not entitled to the assumption of truth. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Generally, a complaint need not contain "detailed factual allegations," but it "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient. Id. at 555, 556 n. 3. In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). The factual allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949-50. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

In asserting its Rule 12(b)(6) argument, Defendants offer a familiar refrain: Counts II through VI of the Amended Complaint allege wrongdoing that was undertaken by ProMera, not Defendants. Based on the same rationale set forth with regards to personal jurisdiction, the Court is disinclined to allow Defendants to deflect Plaintiff's claims in this way. Defendants do not

15

abandon their HTG identities by simply by donning their ProMera hats. The task of disentangling one business identity from the other, particularly in a small company, is far more complicated than Defendants allow. Taken in the light most favorable to Plaintiff, the facts alleged in the Amended Complaint state a plausible claim to relief. Because Plaintiff satisfies the requirements of Rule 8(a)(2), dismissal is inappropriate at this early stage in the litigation.

Nor does the Court agree with Defendant that Plaintiff's claim for injunctive relief, Count VII of the Amended Complaint, must be dismissed at this juncture. Failure to establish irreparable harm for purposes of a preliminary injunction does not bar Plaintiff from obtaining a permanent injunction should sufficient evidence come to light later in the proceedings. The Court is content to allow this claim to go forward at this time.

### III. CONCLUSION

For the reasons stated on the record and further elucidated above, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Docket No. 7) and Defendants' Motion to Dismiss for Failure to State a Claim (Docket No. 36) will be denied. An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE